## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

| | |
|---|---|
| CARPENTERS LABOR-<br>MANAGEMENT PENSION FUND,<br>101 Constitution Avenue, N.W.<br>Washington, D.C. 20001 | Case No. 1:06CV02069-RMU |
| and | |
| DOUGLAS MCCARRON, RICHARD<br>ARISPE, ALAN CHIL'COTE, as<br>Trustees of the CARPENTERS LABOR-<br>MANAGEMENT PENSION FUND,<br>101 Constitution Avenue, N.W.<br>Washington, D.C. 20001 | Judge: Ricardo M. Urbina<br><br>Date Complaint filed:<br>    December 4, 2006 |
| Plaintiffs, | |
| v. | |
| FREEMAN-CARDER, LLC, a<br>Massachusetts Limited Liability<br>Company,<br>20 Sun Street<br>Waltham, MA | |
| Defendant. | |

## AFFIDAVIT OF ADMINISTRATIVE ASSISTANT
## VICKIE CHENEY

The undersigned, hereby declares under penalty of perjury that:

1.  My name is Vickie Cheney. I am over the age of twenty-one and competent
    to make this Affidavit. I am an employee of Zenith Administrators, Inc., the
    Third Party Administrator of the Carpenters Labor-Management Pension
    Fund (the "Pension Fund"), and I act as the chief administrative agent for
    the Trustees of the Pension Fund (the "Trustees"). I have personal
    knowledge of the matters and documents discussed herein, including facts
    that have been elicited from my review of the files in this matter.

2.  Defendant FREEMAN-CARDER, LLC, a Massachusetts Limited Liability
    Company, ("DEFENDANT"), is signatory to a Collective Bargaining

Agreement with Carpenters, Mill-Cabinet & Industrial Workers Local
Union 51 (the "CBA"), and was bound by the CBA at all times relevant to
this case. A copy of the CBA is attached as Exhibit 1 to this Affidavit.

3. In Article 6 of the CBA, DEFENDANT agreed to contribute a set amount to
the Pension Fund for each hour worked by DEFENDANT's employees
covered by the CBA, and to be bound by the Pension Fund's Agreement and
Declaration of Trust ("Trust Agreement"), and any procedures, such as
collection procedures, adopted by the Trustees thereto. A copy o f the
Pension Fund's Trust Agreement is attached as Exhibit 2 to this Affidavit.

4. Article V of the Trust Agreement requires Employers, such as the
DEFENDANT, to pay contributions, to submit to audits to verify the correct
payment of those contributions, to pay certain amounts if contributions are
delinquent, and to be bound by collection procedures established by the
Trustees. Copies of the collection procedures adopted by the Trustees – the
Pension Fund's "Policy On Contribution and Delinquency Collections, And
Audits Of The Carpenters Labor-Management Pension Fund", ("Collection
Policy") and the Pension Fund's Administrative Procedures thereto
("Administrative Procedures") — are attached as Exhibits 3 and 4,
respectively.

5. DEFENDANT employed employees covered by the CBA ("Covered
Employees") during the period from October 2004, and continues to employ
Covered Employees as of the date of this Affidavit.

6. On or about June 29, 2006, PLAINTIFFS and DEFENDANT entered into a
settlement agreement regarding delinquent fringe benefits owed by
DEFENDANT and DEFENDANT executed a Promissory Note. A copy of
the Promissory Note is attached as Exhibit 5.

7. DEFENDANT made three (3) payments on the payment plan and is in
default. DEFENDANT's last payment was made in September 2006. The

balance owing on the payment plan is $21,304.00. Interest from the date of the last payment through March 31, 2007 amounts to $2,087.40, and accrues at the rate of 18% or $10.65 per day.

8. At the time the complaint was filed, DEFENDANT had failed to submit its monthly reports for the period August 2006 through February 2007. Subsequent to the complaint being filed, DEFENDANT has submitted its monthly reports for the period August 2006 through February 2007 without payment for the fringe benefit contributions. True and correct copies of the reports are attached as Exhibit 6.

9. On or about March 19, 2007, payment was made by DEFENDANT for the contributions owing for December 2006.

10. The delinquent contributions for the period August 2006 through February 2007 total $21,852.39.

11. Article IV(A) of the Administrative Procedures specifies that if the Pension Fund is forced to take legal action against an Employer to collect delinquent contributions, the Employer shall be charged—in addition to the unpaid contributions and interest thereon—liquidated damages, audit fees, attorneys' fees, and costs incurred by the Pension Fund.

12. Article III, paragraph (c)(3) of the Collection Policy specifies that liquidated damages shall equal the greater of $750 or twenty percent of the delinquent contributions. Twenty percent of the DEFENDANT's delinquent contributions equals $4,995.90.

13. Section 5.4 of the Trust Agreement specifies that the Trustees may set a reasonable rate of interest to be charged Employers who are delinquent in their contributions. Article III, paragraph (c)(1) of the Collection Policy specifies that the Trustees have set this interest rate at 1.5 percent per month, i.e. 18 percent per year. As of March 31, 2007, the interest due on delinquent contributions owed the Pension Fund by DEFENDANT equals

3

$1,214.08. A breakdown of the amounts owing is attached as Exhibit 7.

14. Therefore, pursuant to section 502(g)(2) of ERISA, 29 USC§ 1132(g)(2), the DEFENDANT's CBA, and the Pension Fund's Trust Agreement, Collection Policy and Administrative Procedures, the total amount owed to the Pension Fund, exclusive of attorneys' fees and costs, is $51,453.77. This amount includes: $21,304.00 balance of the settlement; $2,087.40 interest on the unpaid settlement, $21,852.39 in contributions owed the Pension Fund by DEFENDANT for the period August 2006 through February 2007; liquidated damages in the amount of $4,995.90; and interest as of March 31, 2007 in the sum of $1,241.08, assessed at the rate set by the Trustees in the Collection Policy of 1.5 percent per month from the date the delinquent contributions became due and continuing to accrue at 1.5 percent per month until payment.

15. An audit of DEFENDANT was performed through July 2005. Inasmuch as DEFENDANT under-reported hours for such period and failed to make required contributions to the Pension Fund, it is necessary to conduct another audit for the period August 1, 2005 through the present to determine whether DEFENDANT has continued to under-report hours, and has failed to make the required contributions.

16. As DEFENDANT is a limited liability company organized under the laws of Massachusetts, it is neither an infant, nor an incompetent person, nor a member of the military.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June __/2__, 2007 at Oklahoma City, Oklahoma.

VALERIE WEBSTER
Cleveland County
Notary Public in and for
State of Oklahoma
06001193
My Commission Expires Jan 30, 2010

VICKIE CHENEY
Administrative Assistant of the Carpenters
Labor-Management Pension Fund

4

FREEMAN
CARDER

# ARCHITECTURAL WOODWORKERS
# ASSOCIATION OF NEW ENGLAND

## And

# Carpenters, Mill-Cabinet & Industrial Workers
# Local Union 51,
# of the
# New England Regional Council of Carpenters,
# United Brotherhood of Carpenters and Joiners
# of America

# Shop and Mill Agreement

EXHIBIT NO. 1—1
PAGE NO. 5

ARTICLE                                                                          PAGE

| 1  | OBJECTIVE | 3 |
| 2  | RECOGNITION | 3 |
| 3  | UNION SECURITY AND TRADE AUTONOMY | 3 |
| 4  | HOURS | 4 |
| 5  | OVERTIME | 5 |
| 6  | WAGES and BENEFITS CONTRIBUTIONS | 5 |
| 7  | CLASSIFICATIONS | 6 |
| 8  | SENIORITY | 7 |
| 9  | PAYMENT OF WAGES | 7 |
| 10 | CHECKOFF | 7 |
| 11 | VACATIONS | 7 |
| 12 | HOLIDAYS | 9 |
| 13 | APPRENTICES | 9 |
| 14 | FRINGE BENEFITS CONTRIBUTIONS | 11 |
| 15 | BONDING | 13 |
| 16 | FOREMAN | 13 |
| 17 | UNION LABEL | 13 |
| 18 | SHOP STEWARD | 13 |
| 19 | INJURED CARPENTERS | 14 |
| 20 | TOOLS AND LOCKERS | 14 |
| 21 | DISCIPLINE | 14 |
| 22 | CONDITION OF EMPLOYMENT | 14 |
| 23 | SPECIAL CONDITIONS | 15 |
| 24 | DISPUTES | 15 |
| 25 | LEGALITY | 16 |
| 26 | SAVING CLAUSE | 16 |
| 27 | MOBILITY | 16 |
| 28 | EXPIRATION | 16 |
| 29 | SIGNATORIES | 17 |

EXHIBIT NO. 1-2
PAGE NO. 6



# SHOP AND MILL AGREEMENT

This collective bargaining agreement entered into on this 23rd day of September, 2004 between the Architectural Woodworkers Association of New England, hereinafter referred to as the Employer, and the New England Regional Council of Carpenters and Carpenters, Mill-Cabinet & Industrial Workers Local Union 51, hereinafter referred to as the Union or Employee(s).

## ARTICLE 1
### OBJECTIVE

**Section 1.1**    In order to ensure the public stable conditions, to prevent strikes and lockouts and to ensure a reasonable adjustment and settlement of any and all grievances disputes and differences without stoppage of work and to bring about, as nearly as possible at this time conditions that will tend to stabilize and encourage Shop and Mill work, and construction, alteration and repair of buildings, and the manufacture and installation of the interior equipment commonly associated with the Shop and Mill woodworking industry, all parties have entered into this Agreement.

## ARTICLE 2
### RECOGNITION

**Section 2.1**    The Employer has recognized and acknowledges the New England Regional Council of Carpenters, and Carpenters Mill-Cabinet & Industrial Workers Local Union 51, as the sole and exclusive bargaining agent for all employees, including but not limited to: All Journeyman Cabinet Makers, Cabinet Makers, Hardwood Journeyman Finishers, Finishers, Foreman, Production Workers, General Helper, Apprentices, and Pre-apprentices, and all employees performing work as stated in Article 3, Section 3.6 of the following, but with the exception of office clericals, supervisors and guards.

## ARTICLE 3
### UNION SECURITY AND TRADE AUTONOMY

**Section 3.1**    The Employer and the Union jointly agree that in the employment of employees to perform the various classifications of labor required in the work covered by this Agreement, neither will discriminate against applicants because of membership or non-membership in the Union.

**Section 3.2**    On and after the sixtieth (60) day following the beginning of employment all employees covered by this Agreement, or the effective date of this Agreement, whichever is later, shall become and remain members in good standing in the Union as a condition of employment.

**Section 3.3**    In the event that an employee fails to tender the admission fee or that a member of the Union fails to maintain his/her membership in accordance with the provisions of this Article, the Union shall notify the Employer in writing. Such notice shall constitute a request to the Employer to terminate said individual within forty-eight (48) hours for failure to maintain continuous good standing in the Union. If during the forty-eight (48) hours the employee does not tender his/her admission fee or dues, the Employer shall terminate him/her at the end of the forty-eight (48) hours.

**Section 3.4**    In the event that the Union does not accept into membership any employee tendering the admission fee and the regular monthly Union fees, the foregoing shall not be applicable, provided however, that the Union may at any time thereafter, decide to take such employee into membership, in which case said employee shall be required to tender full and uniform admission fees in effect to the Union not later than thirty (30) days following notification by the Union and shall thereafter be required to maintain his/her membership in accordance with the provisions of the foregoing paragraph, the Union shall notify the Employer and the Employer shall terminate the employment of such employee, after notice, at the end of the forty-eight (48) hour period.

3

EXHIBIT NO. 1-3
PAGE NO. 7



**Section 3.5**    The Employer has agreed that the autonomy claimed by the New England Regional Council of Carpenters shall be incorporated in this agreement by reference. The Union further agrees that if any Union claiming the right to do work in contravention of the autonomy established by the New England Regional Council of Carpenters, engages in a strike or other work stoppage, and establishes a picket line to enforce its claim to such work, the New England Regional Council of Carpenters shall not recognize such picket line.

**Section 3.6**    The Employer agrees that no member of Local 51 be displaced by any other worker, whether or not a member of another Local Union, nor shall the employment of the aforementioned workers result in the lay-off or work week reduction to members of Local 51. The Employer also agrees that the establishment of a production operation will not curtail the work currently enjoyed by members of Local 51 in the same plant, or in another plant in which the Employer has a financial and controlling interest.

**Section 3.7**    In the event of a non-sanctioned or unauthorized stoppage of work by members of this Union, the Union shall at once order such members to immediately resume work.

**Section 3.8**    The Employer agrees not to contract or subcontract work out with the purpose of subverting the terms of this Agreement.

**Section 3.9**    In light of the present economy and the lack of available labor, the employer shall be entitled to hire casual labor to perform support work such as loading and unloading trucks, stock materials, running materials, obtaining supplies, etc. Such employees shall not perform more than 24 hours of work and shall not be covered by this agreement of the terms herein.

## ARTICLE 4
### HOURS

**Section 4.1**    Eight hours shall constitute a normal workday for work performed between the hours of 7:00 a.m. and 12:00 noon, and 12:30 p.m. and 4:30 p.m. on Monday, Tuesday, Wednesday, Thursday and Friday. Change in the hours may be allowed with the mutual approval of the Employer and the majority vote of the employees with written notice from the Employer or shop steward to the Council Representative prior to implementation.

**Section 4.2**    For shops working ten (10) hour days, four (4) days a week, the ten (10) hours shall constitute a normal workday for work performed between the hours of 7 a.m. and 12 noon, and 12:30 p.m. and 5:30 p.m. on Monday, Tuesday, Wednesday and Thursday. Change in hours may be allowed with mutual approval of the Employer and majority vote of the employees with written notice from the Employer to the Council Representative prior to implementing.

**Section 4.3**    Shift work shall be permitted under the following conditions:

(A)    Where a job has more than one eight (8) hour shift in any one twenty-four (24) hour work period, employee(s) shall not be permitted to work more than one shift in one workday except at the overtime rate.

(B)    All extra shifts shall receive eight (8) hours pay for seven and one half (7 1/2) hours worked.

**Section 4.4**    Permits for shift work must be obtained from the Council Representative of the Local in writing twenty-four (24) hours prior to the start of shift work, in order that proper arrangements can be made.

**Section 4.5**    No shift permit will be issued for less than three- (3) consecutive day's work.

**Section 4.6**    No employee shall be permitted to work in any other shop after he has worked a normal workday at his regular place of employment.

4

EXHIBIT NO. 1-4
PAGE NO. 8

## ARTICLE 5
### OVERTIME

**Section 5.1**    Work performed in excess of eight (8) hours on any weekday (Monday-Friday), provided the employee works his regular scheduled workweek, shall be paid at one and one half (1 ½) the regular hourly rate. Work performed on Saturday shall be paid at one and one half (1 ½) the regular hourly rate. Work performed on Sunday shall be paid at two (2) times the regular hourly rate and work performed on Holidays shall be at two (2) times the regular hourly rate plus the Holiday pay.

**Section 5.2**    For shops working four(4) - ten (10) hour shift pursuant to Section 4.2 work performed in excess of ten (10) hour shift on any weekday Monday – Thursday, provided the employee works his regular scheduled workweek, shall be paid at one and one half (1 ½) the regular hourly rate. Work performed on Friday and Saturday shall be paid at one and one half (1 ½) the regular hourly rate. Work performed on Sunday shall be paid at two (2) times the regular hourly rate and work performed on Holidays shall be at two (2) times the regular hourly rate plus the Holiday pay.

**Section 5.3**    The first opportunity for overtime work shall be given to the employee(s) working on a particular job prior to the overtime period. The second opportunity for overtime work shall be offered to all other qualified and competent employees based on seniority. Should no such employee volunteer for overtime work when offered, qualified and competent employees shall be assigned to perform the work on a reverse seniority basis, except that no employee shall be assigned overtime a second time until all other qualified and competent employees have been assigned or volunteered for overtime work.

**Section 5.4**    All work performed on Saturdays, Sundays and Holidays shall be reported by the Employer or shop foreman to the shop steward or steward's appointee, who shall in turn notify the Council Representative. The steward shall be given first option on overtime if he/she is capable of doing the work.

**Section 5.5**    Employee(s) working any authorized fraction of the hour over the regular shift work period shall be paid at the overtime rate. Fractions to be defined as any portion of a fifteen (15) minute period, such as: an employee working sixteen minutes overtime shall receive thirty minutes pay at the overtime rate; an employee working thirty-one minutes overtime shall receive forty-five minutes pay at the overtime rate; an employee working forty-six minutes shall receive sixty minutes pay at the overtime rate.

**Section 5.6**    Work performed in excess of eleven (11) hours shall have a ten (10) minute break.

## ARTICLE 6
### WAGES And BENEFIT CONTRIBUTIONS

**Section 6.1**    Schedule:

Journeyman Cabinetmaker/Finisher

| Date | W | H/B | MSCPF | CLMPF | MSCAF | ATF | NATF | CLMP | CCWA | Total | DA |
|------|------|------------|--------|---------|--------|--------|--------|--------|--------|--------|-------|
| 9/1/2004 | $20.00 | Article 14 | $ 0.05 | $ 1.50 | $ 1.00 | $0.10 | $0.01 | $0.01 | $ 0.01 | $22.68 | $0.30 |
| 9/1/2005 | $20.60 | Article 14 | $ 0.05 | $ 1.50 | $ 1.00 | $0.10 | $0.01 | $0.01 | $ 0.01 | $23.28 | $0.31 |
| 9/1/2006 | $21.20 | Article 14 | $ 0.05 | $ 1.50 | $ 1.00 | $0.10 | $0.01 | $0.01 | $ 0.01 | $23.88 | $0.32 |

Cabinetmaker/Finisher

| Date | W | H/B | MSCPF | CLMPF | MSCAF | ATF | NATF | CLMP | CCWA | Total | DA |
|------|--------|------------|-------|--------|--------|--------|--------|--------|--------|--------|-------|
| 9/1/2004 | $18.05 | Article 14 | $  - | $ 0.75 | $ 0.75 | $0.10 | $0.01 | $0.01 | $ 0.01 | $19.68 | $0.27 |
| 9/1/2005 | $18.55 | Article 14 | $  - | $ 0.75 | $ 0.75 | $0.10 | $0.01 | $0.01 | $ 0.01 | $20.18 | $0.28 |
| 9/1/2006 | $19.05 | Article 14 | $  - | $ 0.75 | $ 0.75 | $0.10 | $0.01 | $0.01 | $ 0.01 | $20.68 | $0.29 |

EXHIBIT NO. 1-5
PAGE NO. 9

Production Worker

| Date | W | H/B | MSCPF | CLMPF | MSCAF | ATF | NATF | CLMP | CCWA | Total | DA |
|------|------|-----------|-------|--------|--------|--------|--------|--------|--------|---------|--------|
| 9/1/2004 | $11.75 | Article 14 | $ - | $ 0.50 | $ 0.50 | $0.10 | $0.01 | $0.01 | $ 0.01 | $12.88 | $0.18 |
| 9/1/2005 | $12.15 | Article 14 | $ - | $ 0.50 | $ 0.50 | $0.10 | $0.01 | $0.01 | $ 0.01 | $13.28 | $0.18 |
| 9/1/2006 | $12.55 | Article 14 | $ - | $ 0.50 | $ 0.50 | $0.10 | $0.01 | $0.01 | $ 0.01 | $13.68 | $0.19 |

General Helper

| Date | W | H/B | MSCPF | CLMPF | MSCAF | ATF | NATF | CLMP | CCWA | Total | DA |
|------|---------|-----------|-------|--------|-------|-----|------|-----|------|---------|--------|
| 9/1/2004 | $ 9.55 | Article 14 | $ - | $ 0.20 | $ - | $ - | $ - | $ - | $ - | $ 9.75 | $0.15 |
| 9/1/2005 | $ 9.80 | Article 14 | $ - | $ 0.20 | $ - | $ - | $ - | $ - | $ - | $10.00 | $0.15 |
| 9/1/2006 | $10.05 | Article 14 | $ - | $ 0.20 | $ - | $ - | $ - | $ - | $ - | $10.25 | $0.15 |

## DEFINITIONS

| W | - Wages |
|---|---|
| H/B | - Premium Co-pay Employer pays 90% and Employee pays 10%. |
| MSCPF | - Massachusetts State Carpenters Pension Fund |
| CLMPF | - Carpenters Labor-Management Pension Fund/Industrial Pension Plan |
| MSCAF | - Massachusetts State Carpenters Annuity Fund |
| ATF | - Apprenticeship Training Fund |
| NATF | - National Apprenticeship Training Fund |
| CLMP | - Carpenters Labor Management Program |
| CCWA | - Certified Custom Woodworkers Association |
| DA | - Dues Assessment (amount deducted from each employees wages per hour for all hours paid) |

**Section 6.2**    Employees with added responsibility now receiving above the present established rate may receive a pro rate increase based on the foregoing journeyman's rate. It is further understood that the Shop Foreman shall receive not less than sixty (60) cents per hour above the journeyman's rate.

**Section 6.3**    The Union may allocate any portion of the wage increase in this Contract to any Benefit Fund upon sixty- (60) days notice in writing to the Employer or Association.

**Section 6.4**    If the contribution rate for any Fund should decrease during the term of this agreement, the amount of that decrease shall be allocated to the basic wage rate.

## ARTICLE 7
## CLASSIFICATIONS

**Section 7.1**    Journeyman Cabinetmaker:    Shall have the ability to read blue prints, shop prints, make layouts and have good knowledge of basic machinery.

**Section 7.2**    Journeyman Finisher:    Shall have the ability to match stains, spray finish and have good working knowledge of equipment.

**Section 7.3**    Cabinetmaker/Finisher: Apprentices indentured after April 30, 2000 shall have their wages calculated as apprentices under Cabinetmaker/Finisher classification. Upon completion of four years, such employees shall be paid as Cabinetmaker/Finisher as set forth in Article 6, Section 6.1.

**Section 7.4**    Production Worker:    Ratio- The Employer can hire no more than two (2) Production Workers for every five (5) Journeyman Cabinetmaker/Finisher employed in the shop except by agreement with the Council Representative. The ratio of two (2) to five (5) must be maintained at all times including during layoffs.

**Section 7.5**    General Helper: Shall supply material as needed, assist workers on machinery and bench, and can hand sand and use finish sanders. General Help shall not be permitted to perform any work of a Journeyman Cabinet Maker/Finisher and Cabinet Maker/Finishers

EXHIBIT NO. __1-6__

PAGE NO. __10__



Cabinet Maker/Finisher and Cabinet Maker/Finishers.

**Section 7.6**    Reclassification from Cabinetmaker/Finisher to Journeyman Cabinetmaker/Finisher is solely in discretion of company.

**Section 7.7**    Grandfather Clause:    Members of United Brotherhood of Carpenters working as Journeyman Cabinet Maker/Finisher in a Local 51 shop prior to 5/1/2000 shall be grandfathered under the Journeyman Cabinet Maker/Finisher classification.    Apprentices indentured prior to May 1, 2000 shall have their wages calculated as apprentices under the Journeyman Cabinetmaker/Finisher classification as set forth in Article 6, Section 6.1.

### ARTICLE 8
### SENIORITY

**Section 8.1**    In the event of layoff for lack of work, Journeyman Cabinetmakers/Finishers shall be laid off after Cabinetmaker/Finishers.    Journeyman Cabinetmaker/Finishers shall be recalled from layoff before Cabinetmaker/Finishers.

### ARTICLE 9
### PAYMENT OF WAGES

**Section 9.1**    Employee(s) is to be paid weekly; payday shall have a fixed schedule every week and no later than Friday of the following week the work was performed.

**Section 9.2**    Employee(s) to be paid on the job during working hours.

**Section 9.3**    No employee(s) shall perform work on piecework basis.

**Section 9.4**    Employee(s) who is not paid before the expiration of the regular pay day, for the time period he is being paid for, shall be paid for the time waited at the rate applicable to the time period waited.

**Section 9.5**    Employee(s) who is discharged or laid-off shall receive one (1) hour's notice, or receive one (1) extra hour's pay in lieu of such notice, and be paid in full.

**Section 9.6**    Employee(s) who voluntarily quits shall be paid no later than the first regular payroll day following, either in person or postmark date.

**Section 9.7**    The Employer agrees to provide annually, or within thirty- (30) days separation, an itemized account of the employee(s) earnings, deductions and all contributions made on behalf of the employee(s) by the Employer, including Health Benefits Fund contributions, Pension Fund contributions and Annuity Fund contributions.

### ARTICLE 10
### CHECKOFF

**Section 10.1**    It is agreed that upon submission by the Union of a written authorization of an employee, the Employer shall deduct the dues assessments or any assessments authorized by the employee from an employee's wages and payment shall be made on a prescribed form furnished by the Massachusetts Carpenters Central Collection Agency. Such payment shall be made to the Agency monthly and not later than the thirtieth (30) day of the calendar month following the performance of the work.

### ARTICLE 11
### VACATIONS

**Section 11.1**    The base period for computing vacation benefits shall be the year June1 to May 31.    Straight time earnings shall be determined by multiplying the total hours worked by the straight time hourly rate.

EXHIBIT NO. 1—7

PAGE NO. 11

**Section 11.2**    Any employee in the employ of an Employer on June 1, who has six (6) months up to nine (9) months of service with any Employer shall be entitled to one (1) weeks vacation with pay based on two (2%) percent of his/her straight time earnings, any employee with ten (10) months employment with said Employer shall receive one (1) week full pay from said Employer.

**Section 11.3**    Any employee who quits or whose service is terminated between June 1 and May 31, who has been employed for six (6) months up to nine (9) months by any Employer shall receive with his/her final pay check a payment based on two (2%) percent of his/her straight time earnings, employee's with ten (10) months shall receive one (1) week pay from said Employer.

**Section 11.4**    Any employee in the employ of an Employer on June 1, who has five or more years of service with Employer, shall be entitled to two (2) weeks vacation with pay based on four (4%) up to nine (9) months, ten (10) months, two (2) weeks full pay from said Employer.

**Section 11.5**    Any employee who quits or whose service is terminated between June1, and May 31, who has been employed for five (5) or more years by any Employer, shall receive with his/her final pay check a payment of four (4%) up to nine (9) months straight time earnings, ten (10) months shall receive two (2) weeks full pay from said Employer.

**Section 11.6**    Effective August 1, 2001 any employee working for any signatory Employer shall receive the following vacation:

> After -8 years - 11days
> After -9 years - 12days
> After 10 years - 13days
> After 11 years - 14days
> After 12 years - 15days

**Section 11.7**    Any employee in the employ of an Employer on June 1, who has the appropriate years of service in Section 12.6 shall be entitled to the appropriate days off with pay based on six (6%) of straight time earnings up to nine (9) months, ten months receive full days pay for each day of vacation time earned.

**Section 11.8**    Any employee who quits or whose service is terminated between June 1, and May 31, who has been employed for appropriate time set in Section 12.6 by the Employer, shall receive with his/her final pay check a payment of six (6%) up to nine months straight time earnings, ten (10) months shall receive the appropriate full days pay for each vacation day earned.

**Section 11.9**    Employees entitled to three (3) weeks of vacation may take three (3) consecutive weeks of vacation subject to approval of the company.

**Section 11.10**    It shall be mandatory for an eligible employee to take his/her vacation within the calendar year. If the Employer shuts down the plant, vacation shall be taken at that time. Otherwise, vacation shall be taken at a time that is mutually agreeable between the Employer and the employee.

**Section 11.11**    If the Employer decides to shut down its plant for a vacation period, thirty- (30) days written notice shall be posted, except in case of emergency, such as Act of God or other reasons beyond the control of the Employer.

**Section 11.12**    The Employer shall be allowed up to ten (10) working days to pay a terminated employee his/her vacation pay. Failure to do so will oblige the Employer to pay one ($1.00) per day for a maximum of thirty- (30) calendar days. Penalty to start after ten- (10) Working days.

8

EXHIBIT NO. 1 - 8
PAGE NO. 12



## ARTICLE 12
## HOLIDAYS

**Section 12.1**    The Employer agrees to pay the employee(s) eight (8) hours straight time pay for the following non-worked Massachusetts legal holidays, regardless of the day on which the holiday falls:

New Year's Day
Washington's Birthday
Patriot's Day
Memorial Day
Independence Day

Labor Day
Columbus Day
Veteran's Day
Thanksgiving Day and the Day after Thanksgiving
Christmas Day

**Section 12.2**    A member(s) of the Union who is employed during the pay week in which any of the foregoing holidays fall, shall be paid for such holidays at the regular rate, regardless of the day of the week on which the said holiday falls, in addition to the wages earned by him/her during such week as a result of his/her labor.

**Section 12.3**    If a holiday falls within an employee's vacation period, he/she shall be entitled to the option of receiving an additional one (1) days pay, or another day off with pay during the year. The date of this holiday shall be determined by mutual agreement with the Employer. If the employee should resign or should be laid off prior to the taking of any holiday due him/her, he/she shall receive the holiday pay in his/her pay.

**Section 12.4**    No employee(s) shall be eligible to receive unworked holiday pay unless he/she has worked the regularly scheduled workday preceding the holiday and the regularly scheduled workday following the holiday in question. Eligibility for holiday shall be determined in no other way; the employee(s) name must appear on the payroll and show wages earned in the week that holiday pay is claimed. However, if an employee(s) does not work the regular scheduled workday following the holiday for demonstrated good cause, he/she shall be eligible for holiday pay. If an employee(s) is laid off less than fourteen (14) calendar days prior to a holiday, he/she shall be paid holiday pay.

**Section 12.5**    The Employer agrees that an employee(s) who is normally a shop and mill man, but who is sent outside to work during the eligible holiday period for five (5) or more days following the holiday shall not be entitled to holiday pay.

**Section 12.6**    Change in Holiday date observed may be allowed with the mutual approval of the Employer and a majority vote of the employees with written notice from the Employer to the Council Representative prior to implementation. Example: Work Columbus Day, for the day after Christmas off with pay.

## ARTICLE 13
## APPRENTICES

**Section 13.1**    As a condition of employment, all apprentices shall attend apprenticeship-training classes, as directed by the Joint Apprenticeship Committee.

**Section 13.2**    Each Employer may employ a ratio of no more than one (1) apprentice to five (5) journeymen members when indentured apprentices are available.

**Section 13.3**    Both parties agree to comply with the Standards of Apprenticeship, as established by the Carpenters Local Union 51 Joint Apprenticeship Committee and accepted as established by the Federal and State Agencies for the training of Apprenticeship Shop and Mill members.

**Section 13.4**    Apprentices shall be paid the following minimum rate of wages and each increase shall be governed by the months and hours of this schedule:

EXHIBIT NO. 1-9
PAGE NO. 13

| S | M | H | % | 9/1/2004 | DA | 9/1/2005 | DA | 9/1/2006 | DA | Y |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6 | 1000 | 50% | $9.03 | $0.14 | $9.28 | $0.14 | $9.53 | $0.14 | 1st |
| 2 | 6 | 1000 | 55% | $9.93 | $0.15 | $10.20 | $0.15 | $10.48 | $0.16 | |
| 3 | 6 | 1000 | 60% | $10.83 | $0.16 | $11.13 | $0.17 | $11.43 | $0.17 | 2nd |
| 4 | 6 | 1000 | 65% | $11.73 | $0.18 | $12.06 | $0.18 | $12.38 | $0.19 | |
| 5 | 6 | 1000 | 70% | $12.64 | $0.19 | $12.99 | $0.19 | $13.34 | $0.20 | 3rd |
| 6 | 6 | 1000 | 75% | $13.54 | $0.20 | $13.91 | $0.21 | $14.29 | $0.21 | |
| 7 | 6 | 1000 | 85% | $15.34 | $0.23 | $15.77 | $0.24 | $16.19 | $0.24 | 4th |
| 8 | 6 | 1000 | 90% | $16.25 | $0.24 | $16.70 | $0.25 | $17.15 | $0.26 | |
| *C/F | | | 100% | $18.05 | $0.27 | $18.55 | $0.28 | $19.05 | $0.29 | |

## DEFINITIONS

S     - Steps
M     - Months needed to progress
H     - Hours needed to be worked to progress
%     - Percentage of Cabinet Maker/Finisher wages schedule
9/1/04 - Date wage increases take effect
DA    - Dues Assessment deducted from the Apprentices hourly wages
Y     - Year of Apprenticeship
*C/F  - Cabinetmaker/Finisher

**Section 13.5**     The Employer may determine that an apprentice shall not receive his/her contractual increase as set forth in Section 14.4. The Employer shall notify the affected apprentice of its determination. If the affected employee objects to the Employer's determination, the employee shall file a written grievance with the Employer and with the Union within five (5) days of his/her being notified of the Employer's determination. The grievance shall be referred to a Sub-Committee of the Joint Apprenticeship Committee, which shall consist of one representative of the Employer and one of the Union. The decision of the Sub-Committee shall be final and binding.

**Section 13.6**     The Employer shall be required to give at least one days notice prior to laying off an apprentice for lack of work. This notice shall be given orally to the shop steward and foreman, if available, who shall in turn report to the Union.

**Section 13.7**     Notwithstanding any provision to the contrary, the Employer shall have the right to employ thirty (30%) percent of its bargaining unit as pre-apprentices. Pre-apprentices may be used on all functions and machines in the shop, provided they have been properly trained. The rate of wages for pre-apprentices shall be fifty (50%) percent of the Cabinet Maker/Finisher base hourly wage set in Section 13.4.

**Section 13.8**     The Employer shall be required to cover Pre-apprentices and 1st year Apprentices with the Health Plans agreed to in Section 14.3 of this Agreement and to the Apprenticeship Training Fund at the rate set forth in Article 6, Wages, Section 6.1. The Employer shall be required to contribute on behalf of Pre-apprentices and Apprentices to the Carpenters Labor-Management Pension Fund (CLMPF), Massachusetts State Carpenters Annuity Fund (MSCAF), National apprenticeship Training Fund (NATF), Carpenters Labor-Management Program (CLMP) and the Certified Custom Woodworkers Association (CCWA) at the rate set forth in Article 6, Section 6.1, except that contributions shall not be required to CLMPF, MSCAF, NATF, CLMP, and CCWA for the first 1,000 Hours of Service earned by a New Hire in the classification of Pre-apprentice and 1st year Apprentice, regardless of whether such Hours of Service are worked consecutively or non-consecutively.

EXHIBIT NO. 1-10
PAGE NO. 14

"Hours of Service" shall mean:

- Each hour for which a New Hire in the classification of Pre-apprentice and First Year Apprentice is paid, or entitled to payment, for the performance of duties for the Employer; and

- Each hour for which the New Hire is paid, or entitled to payment, by the Employer for a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or leave of absence.

"New Hires" shall mean an employee who is hired by the Employer and has not previously been an employee of the Employer.

**Section 13.9**   Union Security and Trade Autonomy, Article 3, and Check-off, Article 10, shall also apply to Apprentices and pre-apprentices.

**Section 13.10**   The twelve (12) month pre-apprentice period shall be measured from the date of hire until the first anniversary of the date of hire, and at no time shall an employee be allowed to work as a pre-apprentice for more than the one year pre-apprentice period.

## ARTICLE 14
### FRINGE BENEFIT FUND CONTRIBUTIONS

**Section 14.1**   Each Employer subscribes to and agrees to be bound by the provisions of the various Agreements and Declarations of Trust, as originally adopted and as amended from time to time, referred to herein as "The Funds" and ratifies and approves all actions of the Trustees within the scope of said Trust documents of the Funds:

1) H/B – Blue Cross & Blue Shield of Massachusetts Value Plus, Guardian Dental Plan U-1, Guardian Vision Guard "Full Feature" Plan, Life Insurance ($25,000.00) and Short Term Disability ($150.00 for 26 weeks)
2) Massachusetts State Carpenters Pension Fund (P)
3) Carpenters Labor-Management Pension Fund/Industrial Pension Plan (CLMPF)
4) Massachusetts State Carpenters Guaranteed Annuity Fund (A)
5) Shop and Mill Apprenticeship and Training Fund (ATF)
6) National Apprenticeship and Training Fund (NATF)
7) Carpenters Labor Management Program (CLMP)
8) Certified Custom Woodworker Association (CCWA)

**Section 14.2**   Contributions required by this Agreement shall be made for each straight time hour worked to the Massachusetts Carpenters Central Collection Agency for the Funds listed in Section 14.1 of this Article (except for payments to the appropriate health insurance provider and the Carpenters Labor-Management Pension Fund/Industrial Pension Plan), and shall be made monthly, and not later than the thirtieth (30) day of the calendar month following the performance of the work. Payment shall be made in the prescribed manner on the prescribed forms that shall be furnished by the Funds (or Agency).

**Section 14.3**   There shall be no reduction or decrease in the Health, Dental, Vision, Short Term Disability and Life Insurance benefits agreed to upon signature of this Agreement for the life of this Agreement.

EXHIBIT NO. 1 –11
PAGE NO. 15

**Section 14.4** The Employer shall contribute directly to the appropriate health insurance provider as required by this Agreement for each employee who works at least forty (40) hours in a month. Such contributions shall be made no later than the last working day of the month in which the work is performed, and shall be made with the form furnished by the Fund or the Agency. The Employer shall cover the employee(s) who work forty (40) hours in the previous month with the health coverage for the following month.

| Example: | Hired | Work | Coverage |
|---|---|---|---|
| | August | 40 Hours | September 1 |

**Section 14.5** The Employer shall not be required to provide health insurance coverage under Section 14.3 for any "outside" employee working under this Agreement until his/her benefit coverage expires (i.e., outside carpenters may have up to six (6) months coverage after lay-off). Health Fund coverage periods for outside carpenters run from April 1 through September 30 and October 1 through March 31. The Employer would start making contributions on a former outside carpenter with previous coverage beginning in September to cover the employee in October when his/her previous coverage expires, or March to cover the employee in April when his/her previous coverage expires.

**Section 14.6** The Employer shall contribute directly to the Carpenters Labor-Management Pension Fund/Industrial Plan as required by this Agreement for each hour for which an employee receives or is entitled to pay, whether or not the hour is actually worked. Such contributions shall be made, together with the report of employee data required by the Fund and in the format required by the Fund, no later than the 15th day on the month following the month for which the contributions are due.

**Section 14.7** The Employer will be given credit for any contractual contributions to Health and Insurance program.

**Section 14.8** The parties agree that with a thirty- (30) day written notice this Article 14 may be reopened for the purpose of discussing a comparable Health/Welfare Plan and other issues involving health coverage for the employees and their families.

**Section 14.9** Opt-out – When an employee chooses not to accept the Employer-provided health insurance, the Employer shall be relieved of its obligation to make insurance coverage payments. In instances where the employee has opt-out, the Employer shall pay the employee the amount of three hundred $300.00 per month for opting-out of the company plan in the form of a stipend. Stipend shall be paid on the first payday of the month proceeding the month worked. The stipend of three hundred $300.00 dollars shall not change for the life of this Agreement.

**Section 14.10** Employee(s) who terminate their services with their employer must give a two (2) week notice. If the employee(s) fail to complete the two (2) week period the employer shall not be responsible for the Health and Insurance premium for said month. However, if the employer terminates said employee prior to completion of the two (2) weeks the employer shall be responsible for the Health and Insurance premium for the months for which the employee would have qualified had he/she not been terminated.

**Section 14.11** The Employer agrees to contribute to the Massachusetts State Carpenters Pension Fund or any other provider that is mutually agreeable to the Employer and the Union at the sums set forth in Article 6 Wages, Section 6.1, schedule for each member currently participating in the Massachusetts State Carpenters Pension Fund for all straight time hour worked by all these employees covered by this Agreement, and for the term indicated herein. The Employer shall contribute to the Massachusetts State Carpenters Pension Fund only for members in the Journeyman classification who became covered by this agreement on or before May 1, 2000.

**Section 14.12** Failure to contribute shall be a violation of this Agreement. The Union and the Employer mutually recognize the requirement the contributions to be made on a current basis by all Employers who have made one or more contributions, or have entered into this Agreement with the Union requiring such contributions.

EXHIBIT NO. 1 - 12
PAGE NO. 16



Section 14.13   The Employer shall be required to contribute on behalf of General Helpers to the Carpenters Labor-Management Pension Fund (CLMPF) at the rate set forth in Article 6, Section 6.1.

Section 14.14   Health Insurance:

The total cost of health care as presently provided shall be borne ninety (90%) by the Employer and ten (10%) by the employee effective October 1, 2004 and shall not change for the life of this Agreement.

The Union may select any Blue Cross/Blue Shield insurance plan under which the eligible employees will be covered.

## ARTICLE 15
## BONDING

Section 15.1          In order to make certain that all payments to the Funds required by this Contract, including Working Dues Deduction, to be paid to the Union, are made, an Employer shall, at the discretion of the Council Representative of the Union, furnish a standard Fringe Benefit Payment Bond with a one (1) year term. The amount of the Bond shall not be less than twenty (20%) percent of the total Wages, including all fringe benefits, to be paid employees covered by this Agreement for a three (3) month period, or a maximum of twenty five thousand ($25,000.00) dollars.  This bond shall be a minimum of ten thousand ($10,000.00) for any Employer with no prior contribution history to the above Funds upon which to base the Bond amount. Any Employer that has not been past due for any payments for work performed in the twelve (12) month period, shall then be relieved of the Bond, as provided above, then becomes a past due Employer, he/she shall then be required to again post a one (1) year Bond.  Copies of the Bond and or renewal certificates from the Bonding Company, indicating that a Bond has been purchased and paid for by the Employer, must be furnished to the Union prior to any work being performed by employees covered by this Agreement.

## ARTICLE 16
## FOREMAN

Section 16.1      Shop working foreman shall be a member of the United Brotherhood of Carpenters and Joiners of America.

## ARTICLE 17
## UNION LABEL

Section 17.1      It is hereby understood and agreed by the Employer and the Union that an application shall be made for the Union Label to the First General Vice President of the United Brotherhood of Carpenters and Joiners of America. If the application is approved, and the Union Label is issued by the United Brotherhood for the Employer's products, it is understood and agreed that the Label shall remain the property of the United Brotherhood of Carpenters and Joiners of America, and that said Union Label shall at no time be used in any manner that will be detrimental to the interest and welfare of the members of the United Brotherhood of Carpenters and Joiners of America.  Use of said Label may be withdrawn from the mill, shop, factory or manufacturing establishment of the Employer at any time at the discretion of the International Union.

## ARTICLE 18
## SHOP STEWARD

Section 18.1      The Shop Steward shall be appointed by the Union.

Section 18.2      There shall be no discrimination against a member of the Union who shall serve as Shop Steward or on Committee work.

Section 18.3      Shop Stewards shall be allowed necessary time to perform their duties in their shops.  Duties are checking Union work cards and taking up grievances with the Employer prior to calling the Union office.

EXHIBIT NO. 1~13
PAGE NO. 17



**Section 18.4**    If the shop closes down completely, the Shop Steward shall be the last person laid-off, and first person rehired, provided he can competently perform the work required.

**Section 18.5**    The Shop Steward, or designee shall be the sole user of the Union Label, and when the Label is not in use, he/she shall have it locked in his/her toolbox. It shall be the duty of the Shop Steward to see that said Label, Stamp or Die shall not be placed on any manufactured article other than that which is made under the Agreement. Said Label must be applied to the article in the Shop or Mill. The use of the Union Label of the United Brotherhood of Carpenters of America shall be in accordance with its use as common in the Industry.

### ARTICLE 19
### INJURED CARPENTERS

**Section 19.1**    Any employee(s) injured on the job, and requiring medical treatment shall be compensated by the Employer for the full day that the injury was incurred. Employee(s) are to be covered by the Workers Compensation Act.

### ARTICLE 20
### TOOLS AND LOCKERS

**Section 20.1**    Adequate protective facilities shall be provided by the Employer for the Employee(s) tools and personal belongings.

**Section 20.2**    All power driven tools, transits, building levels, and special equipment shall be furnished by the Employer.

**Section 20.3**    Tools belonging to the Employee(s) that are dulled on the job shall be re-conditioned on the job during working hours.

**Section 20.4**    The Employer agrees that insurance policies written to protect the Employer's premises and property from loss shall also include a clause to indemnify the Employee(s) for the loss by fire, or by burglary accompanied by physical or forcible entry on the premises, of his tools and/or other personal property legally and properly on the premises. Such indemnity shall cover the fair value of the tools and/or property lost, not to exceed a total of Five Hundred Dollars ($500.00). Any Employee(s) requesting reimbursement for any loss shall furnish a detailed inventory under oath before being entitled to reimbursement by the Employer or by the Insurance Underwriters. The Steward and the Owner will comprise a list from each employee of their tools. The Steward shall keep a copy of the list of tools.

**Section 20.5**    The Employer may, without prejudice, in its discretion, institute unannounced bag checks and establish other safeguards to control unauthorized use and/or removal from the Company's premises of any Employer property of any kind or description, subject to any subsequent proper action. The Employer agrees that the Shop Steward shall be given the opportunity to be present during any such action, provided the Steward is present in the Shop.

### ARTICLE 21
### DISCIPLINE

**Section 21.1**    No member covered by this agreement, other than probationary employees, shall be disciplined or discharged except for just cause.

### ARTICLE 22
### CONDITION OF EMPLOYMENT

**Section 22.1**    Carpenters shall not be required to fill out or sign any forms, whether before of after being hired, except those required by Federal and State law, with the exception of acknowledging the receipt of copies of company policies regarding sexual harassment and/or safety.

EXHIBIT NO. 1-14
PAGE NO. 18



**Section 22.2**    Employee(s) shall wear and/or use such protective safety devices as are properly designated by the Employer as being conducive to the health, comfort and safety of all the Employee(s). The Employer shall provide such devices without cost to the Employee(s). (Safety shoes shall be an exception to the foregoing) Such devices must be hygienic and approved by the Union. The Employer agrees that all facilities are subject to Municipal and State laws and regulations.

**Section 22.3**    A coffee break not to exceed ten (10) minutes shall be allowed each morning and ten (10) minutes each afternoon, Ten (10) minutes after excess eleven (11) hours.

### ARTICLE 23
### SPECIAL CONDITIONS

**Section 23.1**    Employee(s) working outside the Shop or Mill shall work by the outside Agreement of the New England Regional Council of Carpenters.

**Section 23.2**    No Employee(s) shall furnish the Shop or Employer with hand screws and/or clamps that may be required for work. All such implements shall be furnished by the Employer.

**Section 23.3**    A clean-up time of five (5) minutes is hereby established; abuse of such allowance shall call for the docking of a full fifteen (15) minute period.

**Section 23.4**    **Bereavement Pav:** Employees who have suffered a personal bereavement as a result of the death of a member of their immediate family shall receive up to three (3) days pay for time lost from their regularly scheduled straight time hour's work. The last day for which an employee will be paid is the date of the funeral. For the purposes of the section, it is agreed that a member of the immediate family shall be the employee's spouse, child, mother, father, brother and sister. In the event of the death of an employee's parent-in-law or grandchild or grandparent, the employee shall receive one (1) day's pay for the time lost from the regularly scheduled time hours of work.

### ARTICLE 24
### DISPUTES

**Section 24.1**    In the event a dispute arises between the Employer and the Union, the dispute shall be taken up, in writing, in the first step, between the Steward and the Employer (or its designee), and or the shop foreman, no later than five (5) calendar days following the occurrence of events causing the dispute. The written grievance must state the facts surrounding the grievance as well as the specific section of this Agreement allegedly violated.

**Section 24.2**    If the dispute is not settled promptly, it shall be referred thereafter in writing to the Business Representative of the Union within three (3) calendar days of the failure to settle, who shall meet with the owner of the employer or a designated representative from his Company, in the second step within five (5) calendar days of such referral..

**Section 24.3**    If the dispute is not resolved at this step, the Employer or his designated representative shall meet with the Executive Secretary-Treasurer of the Union or his designated representative no later than seven days following the second step meeting in an effort to resolve the dispute.

**Section 24.4**    If the owner or his designated representative fail to settle the dispute, then the dispute shall be referred to a single arbitrator selected in accordance with the voluntary labor arbitration rules of the American Arbitration Association. Failure to so submit the dispute within the above-mentioned period (by so notifying the Employer, in writing) shall deem the dispute settled on the basis of the last answer given by the Employer.

**Section 24.5**    The costs of such arbitration proceedings shall be shared equally by the parties.

**Section 24.6**    Under no circumstances shall there be any lockout, strike, stoppage of work or interference with the normal performance of work during this Agreement.

EXHIBIT NO. 1-15

PAGE NO. 19



Section 24.7    Not withstanding the previsions in Section 24.6 or any other prevision of this Agreement, if the Employer fails to furnish a bond in accordance with Article 15 - Bonding becomes delinquent to any fringe benefit fund or Insurance Plans or payroll check, the Union shall have the right to remove all Union members after forty-eight (48) hour notice to the Employer

## ARTICLE 25
## LEGALITY

Section 25.1    Any section of this Agreement which is illegal shall not invalidate the legal sections of this Agreement.

## ARTICLE 26
## SAVING CLAUSE

Section 26.1    The parties to this Agreement agree that if any of the provisions or benefits contained in this Agreement are suspended, altered or terminated by a statute, regulation or ruling and any Agency, Tribunal or Court, said provisions or benefit shall be reinstated as soon as possible and with retroactive application if and when permitted by law.

## ARTICLE 27
## MOBILITY

Section 27.1    Shops in good standing shall have the right to send up to, two (2) "Journeyman Cabinetmakers/Finishers" outside for up to ten (10) days. The Employer shall pay the employee(s) the outside wage rate of pay set by the New England Regional Council of Carpenters Agreement for the area in which they are performing their work plus the inside shop benefits set in this Agreement. On the 11th day the members working outside shall receive the appropriate outside stamp. If an Employer falls behind on shop benefits, the shop shall loose the right to use Article 27, Mobility, until all benefits are paid.

## ARTICLE 28
## EXPIRATION

Section 28.1    This Agreement will expire on **August 31, 2007 at 11:59 PM**, but if neither party to this Agreement gives notice in writing to the other party on or before **June 30, 2007**, that it desires a change, then this Agreement shall continue in effect from year to year. If, however, such notice in writing is given to either party to this Agreement, then negotiations shall be entered into for a new Agreement by both parties.

EXHIBIT NO. 1-16
PAGE NO. 20

## ARTICLE 29
### SIGNATORIES

The undersigned Employer accepts the terms of and agrees to become bound by the foregoing agreement between the Association and the Union, and to any amendments, extensions, or successor agreements negotiated by the Union and the Association. If the agreement between the Union and the Association expires before a successor agreement has been negotiated, the terms of the previous agreement shall continue in effect until a successor agreement is negotiated. The duration of this agreement with the undersigned Employer shall be co-extensive with the duration of the agreements between the Union and the Association to which the Employer has agreed to be bound unless either the Union or the undersigned Employer gives notice of its desire for changes in the agreement in accordance with the applicable notice provisions of the agreement between the Union and the Association then in effect.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

ARCHITECTURAL WOODWORKERS
ASSOCIATION OF NEW ENGLAND

_Kenneth F. McCarthy_
ASSOCIATION REPRESENTATIVE

_KENNETH   F. MCCARTHY_
PRINT NAME

_PRESIDENT_
TITLE

_P.O. BOX  190869_
ADDRESS
_ROXBURY_

_MASS._          _02119_
STATE            ZIP CODE

_617 - 427 - 5756_
TELEPHONE #

_617 - 427 - 7312_
FAX #

_OCTOBER 28, 2004_
DATE

NEW ENGLAND REGIONAL
COUNCIL of CARPENTERS, AFL-CIO

_Thomas Harrington_
EXECUTIVE SECRETARY/TREASURER

LOCAL UNION 51, UNITED
BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, AFL-CIO

_Henry G Welsh_
BUSINESS MANAGER

_10/29/04_
DATE

Local Union 51, Shop and Mill (AWANE) Association Agreement August 1, 2004 through August 31, 2007

17

EXHIBIT NO. 1-17
PAGE NO. 21

EXHIBIT NO. 1-18
PAGE NO. 22

# AGREEMENT AND DECLARATION OF TRUST

## of the

## CARPENTERS LABOR-MANAGEMENT PENSION FUND

~~Effective: January 1, 1991~~
January 1, 1989

EXHIBIT NO. 2-1
PAGE NO. 23

AGREEMENT AND DECLARATION OF TRUST

OF THE CARPENTERS LABOR-MANAGEMENT
PENSION FUND

THIS AGREEMENT AND DECLARATION OF TRUST was origi-
nally made and entered into on September 22, 1971, in the City
of Washington, D.C. by and between the UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, (hereinafter
referred to as the "Union"), and various employers of members
of the Union who are or may become parties to this Trust
Agreement (hereinafter referred to as "Employers").

WITNESSETH:

WHEREAS, the Union and/or its subordinate Local
Unions and/or Councils and Employers have entered into or
expect to enter into collective bargaining agreements which
provide, among other things, for the establishment of a
Pension Fund and prescribe the contributions or payments to
be made by the Employers to such Fund; and

WHEREAS, to accomplish the aforesaid purpose, it
was and continues to be desired to establish and maintain a
Pension Fund as a Trust Fund for receiving contributions and
providing benefits for eligible employees; and

WHEREAS, the said Trust Fund is to be known as the
"Carpenters Labor-Management Pension Fund"; and

EXHIBIT NO. 2-2
PAGE NO. 24

WHEREAS, it is desired to set forth the terms and conditions under which the said Fund is to be established and administered; and

WHEREAS, it has been mutually agreed that the Fund shall be administered by Trustees and it is desired to define the powers and duties of the Trustees and the nature of benefits to be provided.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, it is mutually understood and agreed as follows:

ARTICLE I

Definitions

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Agreement:

Section 1.1.  AGREEMENT AND DECLARATION OF TRUST. The terms "Agreement and Declaration of Trust" or "Trust Agreement" shall mean this instrument, including any amendments hereto and modifications hereof.

Section 1.2.  PENSION FUND.  The terms "Pension Fund" or "Fund" shall mean the Carpenters Labor-Management Pension Fund established by the Trust Agreement and shall mean generally the monies and other items of value which comprise the corpus of and additions to the Trust Fund.

2

EXHIBIT NO. 2-3
PAGE NO. 25

Section 1.3.   PENSION PLAN.   The terms "Pension Plan" or "Plan" shall mean the program or programs of pension benefits to be established by the Trustees pursuant to this Agreement and Declaration of Trust.

Section 1.4.   TRUSTEE.   The term "Trustee" shall mean a person designated as Trustee pursuant to Article III of the Trust Agreement, and the successors of such person from time to time in office.   The terms "Board of Trustees," "Board," and "Trustees" mean the Board established by Article III of the Trust Agreement.

Section 1.5.   UNION.   The term "Union" shall mean the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, or its subordinate Local Unions and/or Councils, and shall include a Participating Union, as hereinafter defined.

Section 1.6.   PARTICIPATING UNION.   The term "Participating Union" shall mean the Union or a subordinate Local Union and/or Council which has entered into and has in effect a Collective Bargaining Agreement or other agreements providing for contributions to the Pension Fund.

Section 1.7.   CONTRIBUTING EMPLOYER.   The term "Contributing Employer" shall mean any employer (including employer associations acting on behalf of employers) who is or shall become a party to the Trust Agreement and which has agreed or shall agree in a Collective Bargaining Agreement with the Union to make contributions to the Pension Fund with respect to the employment of Employees, as hereinafter

3

EXHIBIT NO. 2-4
PAGE NO. 26

defined. The successor employer to or the alter ego of any Contributing Employer shall be responsible for any failure of a Contributing Employer to make contributions to the Fund in accordance with Article V of this Agreement and any other written agreement requiring the Contributing Employer to make contributions to the Fund. In the case of an Employer having more than one place of business, the term "Contributing Employer" shall apply only to the places of business covered by the Collective Bargaining Agreement requiring contributions to the Pension Fund.

The term "Contributing Employer" shall also include any Participating Local, or the Pension, Welfare or other Benefit Fund established by such Local, which may make contributions on behalf of its own employees. Such contributions must be in an amount and form approved by the Trustees and must be made on behalf of all the employees of the Participating Local or Benefit Fund, under a written agreement.

The term "Contributing Employer" may also include a corporation wholly owned and operated by a Participant, provided that a written agreement is entered into by the corporation and the Trustees governing the payment of contributions. The term "Contributing Employer" also means any person who is a party to any written instrument which evidences an agreement to be bound by the provisions of the Fund's Agreement and Declaration of Trust; and the term also means any person acting directly as an employer, or indirectly

4

EXHIBIT NO. 2-5
PAGE NO. 27

in the interest of an employer, in relation to the Pension Fund.

Section 1.8.  COLLECTIVE BARGAINING AGREEMENT.  The term "Collective Bargaining Agreement" shall mean any contract by and between an Employer and the Union or Pension Fund Participation Agreement which provides for contributions to this Pension Fund, along with any and all extensions or renewals thereof and successor agreements thereto, in a manner acceptable to the Board of Trustees.  However, the term "Collective Bargaining Agreement" shall not include any two-tier contract, that is a contract which provides for an Employer to contribute to this Pension Fund for some but not all of the work performed for the Employer by Participants in the jurisdiction of the applicable Participating Union.

Section 1.9.  EMPLOYEE.  "Employee" means a person who is an employee of an Employer and who is covered by a Collective Bargaining Agreement requiring Employer contributions on his behalf.  The salaried employees of a Participating Union, or its Pension, Welfare or other Benefit Fund, which is accepted as a Contributing Employer, are also deemed to be Employees.

The term "Employee" shall not include any self-employed person nor any person who is a partner or owner of a non-corporate business organization which is a Contributing Employer.

5

EXHIBIT NO. 2-6
PAGE NO. 28

Section 1.10.  PARTICIPANT.  "Participant" means a Pensioner or an Employee who meets the requirements for participation in the Pension Plan established by the Trustees.

## ARTICLE II

### General

Section 2.1.  ESTABLISHMENT OF FUND.  As hereby created  the Carpenters Labor-Management Pension fund shall comprise the entire assets derived from Employer Contributions made to or for the account of this Pension Fund under Collective Bargaining Agreements together with any and all investments made and held by the Trustees, or monies received by the Trustees as contributions or as income from investments made and held by the Trustees or otherwise, and any other money or property, received and/or held by the Trustees for the uses, purposes and trust set forth in this Agreement and Declaration of Trust.

Section 2.2  GENERAL PURPOSE.  The Fund shall be a Trust Fund and shall be used for the purpose of providing pension benefits, as decided by the Trustees, and shall further provide the means for financing the expenses of the Trustees and the operation and administration of the Fund, in accordance with this Agreement and Declaration of Trust.

6

EXHIBIT NO. 2-7
PAGE NO. 29

ARTICLE III

Trustees

Section 3.1.   UNION AND EMPLOYER TRUSTEES.   The operation and administration of the Pension Fund shall be the joint responsibility of the Trustees appointed by the Employers and the Trustees appointed by the Union.

Section 3.2.   PROCEDURE FOR THE REMOVAL, REPLACEMENT OR ADDITION OF TRUSTEES.   The following procedures are hereby established for the naming of additional Trustees and the removal or replacement of existing Trustees:

(a)   Additional Trustees

The number of Trustees may be increased at any time by a majority vote of the serving Trustees, provided however, that there shall not be more than six Employer Trustees and six Union Trustees.   Appointment of such additional Trustees shall be made in accordance with the procedures described below for "Appointment of Trustees."

(b)   Removal of Trustees

An Employer Trustee may be removed from office at any time by a majority of the Employer Trustees.   A Union Trustee may be removed at any time by a resolution of the Executive Board of the Union, duly certified in writing by the

7

EXHIBIT NO. 2-8
PAGE NO. 30

President and Secretary of the Union.    Notification of removal shall be as described below.

    (c)  Resignation of Trustees

If a Trustee chooses to resign, he must give thirty days' advance written notice by registered mail to the office of the Fund.  The notice shall set forth the date on which the Trustee wishes his resignation to become effective; however, in no event shall the effective date of the resignation be less than thirty days after the date that the notice of resignation is sent to the Fund office, unless the Trustees unanimously agree to allow the effective date of the resignation to be on a date less than thirty days after the date on which the resignation was sent.

    (d)  Appointment of Trustees

    (1)    In the event that any of the Employer Trustees die (or become incapable of acting under the Trust, resign, or are removed) or if the number of Employer Trustees is to be increased as provided hereunder, then a successor or additional Employer Trustee shall immediately be appointed by a majority vote of the Employer Trustees who are serving immediately after such event; provided, however, that in the case of an Employer Trustee resignation, the resigning

8

EXHIBIT NO. 2-9
PAGE NO. 3L

Trustee may vote on the appointment of his successor. The form of notification of such appointment shall be as specified below.

(2) In the event that any of the Union Trustees die (or become incapable of acting under the Trust, resign, or are removed) or if the number of Union Trustees is to be increased as provided hereunder, a successor or additional Trustee shall immediately be appointed by a resolution of the Executive Board of the Union, duly certified in writing by the President and Secretary of the Union. The form of notification of such appointment shall be as specified below.

(e) Notification

Notice of removal or appointment of Employer Trustees as specified above shall be given by a statement in writing signed by the then Employer Trustees and sent to the Office of the Fund. Notice of removal or appointment of Union Trustees as specified above shall be given by a statement in writing by the Union to the Office of the Fund.

9

EXHIBIT NO. 2-10

PAGE NO. 32

(f)    Effective    Date    of    Trustee    Vacancy    and
Appointment

Any instrument of resignation, removal, appoint-
ment, or acceptance of a Trustee shall be effective when duly
sent to the Office of the Fund.

(g)  Term of Trustees

Each Trustee and each successor Trustee shall con-
tinue to serve as such until his death, incapacity, resigna-
tion or removal.

(h)  Miscellaneous

Any Trustee shall, immediately upon appointment as
Trustee, and upon acceptance of his appointment in writing,
become vested with all the property, writings, powers and
duties of a Trustee hereunder, and notice of the appointment
of the successor Trustee shall be given by the Chairman and
the Secretary of the Board of Trustees, to any bank used as a
depository for the Trust Fund, as well as to any other
institution or person holding any of the Trust Fund assets.

Pending appointment of a successor Trustee in
accordance herewith, no vacancy in the Board of Trustees
shall impair the power of the remaining Trustees to admini-
ster the Trust Fund and the Plan.

10

EXHIBIT NO. 2-11
PAGE NO. 33

It is the expressed intent of the parties to the Trust Agreement that the Employers and Employees be equally represented in the administration of said Trust.

Section 2.  TRUSTEES.  The current Trustees are:

(a)  Union Trustees:  Sigurd Lucassen and Leonard B. Zimmerman

(b)  Employer Trustees:    Jack Henson and Alan Chil'Cote

Section 3.3.  ACCEPTANCE OF TRUSTEESHIP.  The Trustees, by affixing their signature at the end of this Agreement and Declaration of Trust, agree to accept the trusteeship and act in their fiduciary capacities strictly in accordance with the provisions of this Agreement and Declaration of Trust.

## ARTICLE IV

### Powers, Duties and Obligations of Trustees

Section 4.1.  PROPERTY AND ASSISTANCE.  The Trustees are authorized and empowered to lease or purchase such premises, materials, supplies and equipment, and to hire and employ and retain such consultants; legal counsel; investment advisor; administrative, accounting, actuarial, clerical and other assistants or employees as in their discretion they may find necessary or appropriate in the performance of their duties and to pay the costs thereof out of the assets of the Pension Fund.

11

EXHIBIT NO. 2-12
PAGE NO. 34

Section 4.2. CONSTRUCTION OF AGREEMENT. The Trustees shall have the power to construe the provisions of this Agreement and Declaration of Trust and the terms used herein. Any construction adopted by the Trustees in good faith shall be binding upon the Union, the Employers and the Employees, and upon the Employees' families, dependents, beneficiaries and legal representatives.

Section 4.3. GENERAL POWERS. The Trustees are hereby empowered, in addition to other such powers as are set forth herein or conferred by law:

> (a) To establish and administer a Pension Plan or Plans on behalf of the Employees referred to in this Trust Agreement; to use and apply the Trust assets to pay or provide for the payment of all reasonable and necessary expenses of: (i) collecting Employer contributions and payments and other monies and property to which the Pension Fund may be entitled and (ii) administering the affairs of this Pension Fund, including the employment of and payment of compensation to and expenses of, such administrative, legal, clerical and other expert assistance; the purchase or lease of such premises, materials, supplies and equipment; and the performance of such other acts as the Trustees, in their sole discretion, find

12

EXHIBIT NO. 2-13
PAGE NO. 35

necessary or appropriate in the performance of their duties.

(b)  To enter into any and all contracts and agreements (including insurance contracts for the indemnification or protection of the Trustees) for carrying out the terms of this Agreement and Declaration of Trust and for the administration of the Pension Fund, and for doing all acts as the Trustees, in their sole discretion, may deem necessary and advisable. Such contracts, agreements and acts shall be binding and conclusive on all the parties hereto and on any Participants or beneficiaries affected.

(c)  To compromise, settle, arbitrate and release claims or demands in favor of or against the Pension Fund or the Trustees on such terms and conditions as the Trustees may deem advisable;

(d)  To establish and accumulate as part of the Fund a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purpose of such Trust;

(e)  To pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Fund and the assets forming a part thereof;

13

EXHIBIT NO. 2-14
PAGE NO. 36

(f)  To make appropriate allocations of common administrative expenses and disbursements shared or to be shared with any other Plan or Fund;

(g)  To receive contributions or payments from any source whatsoever to the extent permitted by law;

(h)  To invest and reinvest the assets of the Pension Fund in any type of investments and to take any and all action with respect to holding, buying, selling or maintaining such investments as they, in their sole discretion, may deem appropriate;

(i)  In their discretion:

    1.  To purchase a group annuity contract or contracts for the purpose of providing some or all of the benefits to be provided under this Pension Fund;

    2.  To appoint a bank or banks or trust company or trust companies or an investment advisor or advisors to perform such services as may be mutually agreed to with respect to the investment and reinvestment of the Fund's assets;

    3.  To appoint a bank or banks or trust company or trust companies to be designated

14

EXHIBIT NO. 2-15

PAGE NO. 37

as a corporate trustee and enter into a trust agreement or trust agreements with such bank or banks or trust company or trust companies to provide for the investment or reinvestment of assets for the Pension Fund with such other provisions incorporated in the agreement as may be deemed necessary or desirable in the Trustees' sole discretion for the proposed management of the Pension Fund and without limit with respect to the powers which the Trustees may grant to such corporate trustee in such agreement to the extent permitted by law;

4. To appoint a bank or banks or trust company or trust companies to be designated as corporate agent or custodian investment advisor or custodian;

5. To appoint an investment manager or managers to manage (including the power to acquire and dispose of) any assets of the Fund.

(j) To do all acts, whether or not expressly authorized herein, that the Trustees may deem necessary or proper for the protection of the property held hereunder and for the admini-

15

EXHIBIT NO. 2-16
PAGE NO. 38

stration of the Pension Fund and the Pension
Plan;

(k)  To establish an escrow bank account or accounts
to the extent deemed necessary in their discre-
tion pending adoption of a Pension Plan or
Plans;

(l)  To do all acts, whether or not expressly autho-
rized herein, to accomplish the general objec-
tive of enabling the Employees to obtain
pension benefits in the most efficient and
economical manner.

Section 4.4.  COMPENSATION AND PERSONAL LIABILITY.
The Union and Employer Trustees shall not receive compensation
for the performance of their duties as Trustees.  However,
they shall be reimbursed for the reasonable travel and inci-
dental expenses incurred in connection with their duties as
Trustees.  In addition, except as otherwise may be provided
by law, the Pension Fund shall pay or reimburse, as is appro-
priate, all reasonable expenses, including attorney fees, of
any action or actions brought by or against any Trustee or
Trustees directly or indirectly arising out of service as a
Trustee.

Neither the Trustees nor any individual or succes-
sor Trustee shall be personally answerable or personally
liable for any liabilities or debts of the Pension Fund con-
tracted by them as such Trustees, or for the non-fulfillment

16

EXHIBIT NO. 2-17
PAGE NO. 39

of contracts, but the same shall be paid out of the Pension Fund. However, nothing herein shall exempt any Trustee from liability arising out of his own willful misconduct, bad faith or gross negligence, or entitle such Trustee to indemnification for any amounts paid or incurred as a result thereof.

The Trustees, to the extent permitted by applicable law, shall incur no liability in acting upon any instrument, application, notice, request, signed letter, telegram or other paper or document believed by them (a) to be genuine, (b) to contain a true statement of facts, and (c) to be signed by the proper person. Any Trustee, to the extent permitted by applicable law, may rely upon any instrument in writing purporting to have been signed by a majority of the Trustees as conclusive evidence of the fact that a majority of the Trustees have taken the action stated to have been taken in such instrument.

The Trustees may in their discretion obtain and maintain policies of insurance, to the extent permitted by law, to insure themselves, the Pension Fund as such, its administrators and other fiduciaries, as well as employees, agents or the professional service providers of the Trustees and of the Pension Fund, while engaged in business and related activities for and on behalf of the Pension Fund: (i) with respect to liability to the Fund and others as a result of acts, errors or omissions of such individuals, provided such insurance policy shall initially provide recourse by the

17

EXHIBIT NO. 2-18
PAGE NO. 40

insurer against such individuals, as may be required by law, and (ii) with respect to accidental death or injuries received or property damage suffered by them. The cost of the premiums for such policies of insurance shall, where not prohibited by law, be paid out of the Pension Fund.

Section 4.5. AUTHORITY TO ENTER INTO AGREEMENTS WITH OTHER TRUSTEES. The Trustees are hereby given authority to enter into agreements with Trustees of other Pension Funds applicable to employees represented by the Union to permit such other Pension Funds to join or merge with this Pension Fund.

Section 4.6. FINANCIAL RECORDS. The Trustees shall keep true and accurate financial records of all Pension Fund transactions, which shall be audited annually or more often, by a certified public accountant selected by the Trustees. A copy of such audit shall be available at all times upon reasonable notice for inspection by signatories to this Agreement at the principal office of the Fund.

Section 4.7. EXECUTION OF DOCUMENTS. The Trustees may authorize an Employer Trustee and a Union Trustee or any joint group equally composed of Employer and Union Trustees to execute jointly any notice or other instrument in writing and all persons, partnerships, corporation or associations may rely thereupon that such notice or instrument has been duly authorized and is binding on the Pension Fund and the Trustees.

18

EXHIBIT NO. 2-19
PAGE NO. 41

Section 4.8.  DEPOSIT AND WITHDRAWAL OF FUNDS.  All monies received by the Trustees hereunder shall be deposited by them in such bank or banks as the Trustees may designate for that purpose and all withdrawals of monies from such account or accounts shall be made only by checks signed by the Trustees authorized in writing by the Trustees to sign such checks.  No check shall be valid unless signed by two persons of whom one shall be a Union Trustee and one an Employer Trustee, except when signed by a designated employee as provided in this Section.

The Employer Trustees shall designate in writing the name or names of any Employer Trustee who may sign checks in the above manner and the Union Trustees shall likewise designate in writing the name or names of the Union Trustees who may sign checks in the above manner.

The Trustees may, in their discretion, designate and authorize an employee of the Fund to sign checks upon such separate and specific bank account or bank accounts as the Trustees may designate and establish for that purpose.

Section 4.9.  SURETY BONDS.  The Trustees and any employees of the Trustees who are empowered and authorized to sign checks shall each be bonded by a duly authorized surety company in such amounts as may be determined from time to time by the Trustees, and in accordance with applicable law.  Any such employee employed by the Trustees who may be engaged in handling monies of the Pension Fund shall also be bonded by a

19

EXHIBIT NO. 2-20
PAGE NO. 42

duly authorized surety company in the same manner. The cost of the premium on such bonds shall be paid out of the Pension Fund.

## ARTICLE V

### Contributions to the Pension Fund

Section 5.1.  RATE OF CONTRIBUTIONS.  In order to effectuate the purposes of the Trust Agreement, each Employer shall contribute to the Pension Fund the amount required by the Collective Bargaining Agreement between the Union and the Employer, and by any other agreement requiring contributions to the Fund with respect to Employees.  The rate of contribution shall at all times be governed by the Agreements then in force and effect, together with any amendments, supplements or modifications thereto.

Section 5.2.  EFFECTIVE TERM OF CONTRIBUTIONS.  All contributions shall continue to be paid as long as the Employer is obligated to contribute by virtue of (a) its agreement, (b) a duty under applicable labor-management relations law (including, but not limited to, the period during which the new agreement is in fact being negotiated), or (c) the provisions of this Agreement and Declaration of Trust.

Section 5.3.  MODE OF PAYMENT.  All contributions shall be payable to the "Carpenters Labor-Management Pension

20

EXHIBIT NO. 2-21
PAGE NO. 43

Fund" and shall be paid in the manner and form determined by the Trustees.

Section 5.4.  DEFAULT IN PAYMENT.  Non payment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payment.  In addition to any other remedies to which the parties may be entitled, an Employer in default for thirty working days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may determine, accruing from the date when the payment was due to the date when payment is made, together with all expenses of collection incurred by the Trustees and/or such liquidated damages as the Trustees may set.  The Trustees may take any action necessary to enforce payment of the contributions due hereunder, including, but not limited to, proceedings at law and in equity.

Section 5.5.  REPORT ON CONTRIBUTIONS.  The Employer shall make all reports on contributions required by the Trustees.  The Trustees may at any time have an audit made of the payroll and wage records of any Employer in connection with the said contributions and/or reports.

21

EXHIBIT NO. 2-22
PAGE NO. 44

ARTICLE VI

Plan of Benefits

Section 6.1.  BENEFITS.  The Trustees shall have full authority to determine all questions of nature, amount and duration of benefits to be provided, based on what it is estimated the Fund can provide without undue depletion or excessive accumulation, provided, however, that no benefits other than pension, death, and severance benefits may be provided for or paid under this Agreement and Declaration of Trust.

Section 6.2.  RECIPIENTS OF BENEFITS.  Benefits may be provided in accordance with Section 6.1 of this Article for any eligible Employee of a Contributing Employer covered by a Collective Bargaining Agreement.

Section 6.3.  ELIGIBILITY REQUIREMENTS FOR BENEFITS. The Trustees shall have full authority to determine eligibility requirements for benefits and to adopt rules and regulations which shall be binding on the Participants and their beneficiaries.

Section 6.4.  METHOD OF PROVIDING BENEFITS.  The benefits shall be provided and maintained by such means as the Trustees shall in their sole discretion determine.

Section 6.5. WRITTEN PLAN OF BENEFITS.  The detailed basis on which payment of benefits is to be made pursuant to this Agreement shall be specified in writing by appropriate

22

EXHIBIT NO. 2-23
PAGE NO. 45

action of the Trustees subject, however, to such changes or modifications by the Trustees, from time to time, as they in their discretion may determine. All such changes or modifications shall similarly be specified in writing by appropriate resolution of the Trustees.

Section 6.6. APPROVAL OF PLAN. The Pension Plan or Plans originally adopted by the Trustees was submitted to the Internal Revenue Service and was determined to be a qualified pension plan under the Internal Revenue Code. The Trustees shall take the necessary steps to amend the Plan to maintain its tax status and the deductibility of Employer contributions to the Pension Fund for income tax purposes, as provided in the Internal Revenue Code. In the event of the failure of the Plan to secure, or retain approval as a qualified pension plan under the Internal Revenue Code, the Trustees shall amend the Plan to effect changes which are necessary to receive or retain such approval.

## ARTICLE VII

### Meetings and Decisions of Trustees

Section 7.1. OFFICERS OF TRUSTEES. The Trustees shall have an elected Chairman and Co-Chairman from among the Trustees. The terms of such officers shall commence on the date of their election and continue until his or their

23

EXHIBIT NO. 2-24
PAGE NO. 46

successors have been selected. At no time shall both offices be held by Trustees designated by the same parties.

Section 7.2. MEETING OF TRUSTEES. The Trustees shall, from time to time, meet in the District of Columbia to make decisions regarding the operation and administration of the Fund. Meetings of the Trustees may be called by the Chairman or Co-Chairman upon twenty-days' notice to the other Trustees and may be held at any time without such notice if all the Trustees consent thereto in writing. Additional meetings of the Trustees to be held outside the District of Columbia may be called by the Chairman or Co-Chairman.

Section 7.3. ACTION BY TRUSTEES WITHOUT MEETING. Action by the Trustees may also be taken by them in writing without a meeting, provided, however, that in such cases there shall be unanimous written concurrence by all of the Trustees.

Section 7.4. QUORUM. In all meetings of the Trustees, two Trustees shall constitute a quorum for the transaction of business providing that there is at least one Employer Trustee and one Union Trustee present at the meetings. The vote of any absent Trustee shall be cast by the Trustee present, designated by the same party, with the same force as if such absent Trustee were present. If at any time there is an unequal number of Employer and Union Trustees appointed, the Employer Trustees and the Union Trustees shall

24

EXHIBIT NO. 2-25
PAGE NO. 47

have equal voting strength with the difference in the number appointed treated as absent Trustees.

Section 7.5. MAJORITY VOTE OF TRUSTEES. All action by the Trustees shall be by majority decision of the Trustees. Such majority vote shall govern not only this Article but any portion of this Agreement and Declaration of Trust which refers to action by the Trustees. In the event any matter presented for decision cannot be decided because of a tie vote, or because of the lack of a quorum at two consecutive meetings, the matter shall then be submitted to arbitration as hereinafter provided.

Section 7.6. MINUTES OF MEETINGS. The Trustees shall keep minutes of all meetings but such minutes need not be verbatim. Copies of the minutes shall be sent to all Trustees.

## ARTICLE VIII

### Impartial Arbitrator

Section 8.1. APPLICATION OF THIS ARTICLE. If a matter is in dispute and the Trustees cannot agree on an arbitrator, either the Employer Trustees or the Union Trustees or both may apply to the American Arbitration Association for the designation of an arbitrator who will decide any disputes among the Trustees or any other matter submitted to arbitration in accordance with the provision of Article VII, Section

25

EXHIBIT NO. 2-24
PAGE NO. 48

7.5.    The decisions of the arbitrator shall be final and binding.

Section 8.2.    EXPENSES OF ARBITRATION.    The cost and expense incidental to any arbitration proceedings, including the fee, if any, of the impartial arbitrator, shall be proper charges against the Fund, and the Trustees are authorized to pay such charges.

## ARTICLE IX

### Execution of Agreement and Declaration of Trust

Section 9.1.    COUNTERPARTS.    The Agreement and Declaration of Trust may be executed in any number of counterparts. The signature of a party on any counterpart shall be sufficient evidence of his execution thereof.

Section 9.2.    WRITTEN INSTRUMENT.    An Employer may adopt and become a party to this Agreement and Declaration of Trust by executing a counterpart hereof or by executing any other written instrument wherein the Employer agrees to participate in the Fund pursuant to the terms of this Agreement and Declaration of Trust and upon consent by the Trustees.

## ARTICLE X

### Amendment to Agreement and Declaration of Trust

Section 10.1.    AMENDMENT BY TRUSTEES.    This Agreement and Declaration of Trust may be amended in any respect, from

26

EXHIBIT NO. 2-27
PAGE NO. 49

time to time, by the Trustees, provided that each amendment shall be duly executed in writing by the Trustees. As to any amendment, the Trustees in their discretion shall have the power to fix the effective date thereof. Notice of the proposed amendment shall be given prior to Trustee meetings, unless the notice requirement is waived by the Trustees.

Section 10.2. LIMITATION OF RIGHT TO AMENDMENT. No amendment may be adopted which will alter the basic principles of this Agreement and Declaration of Trust, be in conflict with the terms of applicable Collective Bargaining Agreements to the extent that such terms affect contributions to the Pension Fund, be contrary to the laws governing the Pension Fund, or be contrary to any agreements entered into by the Trustees. Under no circumstances shall any amendment be adopted which will in any way alter Article XIII, Section 13.1.

Section 10.3. NOTIFICATION OF AMENDMENT. Whenever an amendment is adopted in accordance with this Article, a copy thereof shall be distributed to all Trustees, and the Trustees shall so notify all necessary parties and shall execute any instrument or instruments necessary in connection therewith.

27

EXHIBIT NO. 2-28
PAGE NO. 50

## ARTICLE XI

### Termination of Trust

Section 11.1.  BY THE TRUSTEES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing executed by all the Trustees when there is no longer in force and effect a Collective Bargaining Agreement requiring contributions to the Fund.

Section 11.2.  BY THE PARTIES.  This Agreement and Declaration of Trust may be terminated by an instrument in writing duly executed by all the Employers and the Union.

Section 11.3.  PROCEDURE ON TERMINATION.  In the event of the termination of this Agreement and Declaration of Trust, the Trustees shall apply the Pension Fund to pay or to provide for the payment of any and all obligations of the Fund and shall distribute and apply any remaining surplus in such manner as will, in their opinion, best effectuate the purpose of the Fund provided, however, that no part of the corpus or income of said Fund shall be used for or diverted to purposes other than for the exclusive benefits of the Employees, their families, beneficiaries or dependents, or to pay the administrative expenses of the Fund or for other payments in accordance with the provisions of the Trust Agreement and Pension Plan.

Section 11.4.  NOTIFICATION OF TERMINATION.  Upon termination of the Fund in accordance with this Article, the

28

EXHIBIT NO. 2-29
PAGE NO. 51

Trustees shall forthwith notify the Union and each Employer, who are parties hereto, and also all other necessary parties, including, but not limited to, the appropriate federal government agencies; and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Trust.

## ARTICLE XII

### Employer Withdrawal Liability

Section 12.1.  IN GENERAL.

(a)  An employer that withdraws from the Plan after April 28, 1980, in either a complete or partial withdrawal, shall owe and pay withdrawal liability to the Plan, as determined under this Article and ERISA.

(b)  For purposes of this Article, all corporations, trades or businesses that are under common control, as defined in regulations of the Pension Benefit Guaranty Corporation ("PBGC"), are considered a single employer, and the entity resulting from a change in business form described in Section 4218(1) of ERISA is considered to be the original employer.

29

EXHIBIT NO. 2-30
PAGE NO. 52

Section 12.2.   COMPLETE WITHDRAWAL DEFINED.

(a)  A complete withdrawal of a Construction Employer occurs if:

    (1)  One or more of the Collective Bargaining Agreements under which the Employer has been obligated to contribute terminates and is neither renewed nor extended, and

    (2)  The Employer:

        (A)  Continues to perform work, in the jurisdiction of the Collective Bargaining Agreement, of the type for which contributions were previously required; or,

        (B)  Resumes such work within five years after the date on which the obligation to contribute ceased, and does not renew the obligation at the time of the resumption.

(b)  A Construction Employer is an Employer that contributes to the Pension Fund for work performed in the building and construction industry, if substantially all of the Employees for whom the Employer is obligated to contribute perform work in that industry.

(c)  For purposes of this Article, a Construction Employer's obligation to contribute is not

30

EXHIBIT NO. 2-31
PAGE NO. 53

considered to have ceased solely because the Employer is not, at the particular time, engaged in work for which it has an obligation to contribute.

(d) For purposes of this Article, "Terminated Agreement" means the Collective Bargaining Agreement with respect to which the withdrawal occurred.

(e) The date of complete withdrawal of a Construction Employer is the date the Employer last contributed pursuant to the Terminated Agreement.

(f) The complete withdrawal of a Non-Construction Employer occurs when the employer:

    (1) Permanently ceases to have an obligation to contribute, or

    (2) Permanently ceases all operations for which the Employer had an obligation to contribute.

(g) A "Non-Construction Employer" is an Employer other than a Construction Employer as defined in subsection (b).

(h) The date of the complete withdrawal of a Non-Construction Employer is the date the Employer's obligation to contribute ceased or the

31

EXHIBIT NO. 2-32
PAGE NO. 54

date its covered operations ceased, whichever is earlier.

(i) For purposes of this section, a withdrawal is not considered to occur solely because the Employer temporarily suspends contributions during a labor dispute involving its Employees. However, the Fund will proceed on the assumption that a withdrawal has taken place if contributions by an Employer cease and the Fund has not been notified, in writing, of reasons that the cessation of contributions does not constitute a withdrawal.

Section 12.3.    AMOUNT OF LIABILITY FOR COMPLETE WITHDRAWAL.

(a) General.    The amount of an Employer's liability for a complete withdrawal shall be its initial liability amount, reduced in accordance with subsection (h).    The amount shall be determined as of the end of the Plan Year preceding the date of the Employer's withdrawal.

(b) Initial Liability Amounts.    The initial liability amount is:

(1) "Old" Employer.    In the case of an Employer that was obligated to contribute for any part of the period from April 29,

32

EXHIBIT NO. 2-33
PAGE NO. 55

1980, through December 31, 1980, the sum of:

    (A) Its proportional share of the balance of the Plan's unfunded vested liability as of December 31, 1979; plus,

    (B) The sum of its proportional shares of the balances of the changes in the Plan's unfunded vested liability and of the reallocated liability amounts for each Plan Year that ended after December 31, 1979, and before the date of the Employer's withdrawal.

(2) "New" Employer. In the case of an Employer that was first obligated to contribute after December 31, 1979, the sum of its proportional shares of the balances of the changes in the Plan's unfunded vested liability and of the reallocated amounts for each Plan Year that ended after December 31, 1979, and before the date of the Employer's withdrawal.

(c) Unfunded Vested Liability Defined.

(1) For purposes of this Article, the term "vested benefit" means a benefit for which

33

EXHIBIT NO. 2-34
PAGE NO. 5⟊

a Participant has satisfied the conditions for entitlement under the Plan (other than the conditions of submitting a formal application for benefits, actual retirement, or completing a required waiting period) whether or not the benefit may subsequently be reduced or suspended by a Plan amendment, an occurrence of any condition, or operation of law and whether or not the benefit is considered "vested" or "nonforfeitable" for any other purpose under the Plan.

(2)  The Plan's liability for vested benefits as of a particular date is the actuarial value of the vested benefits under the Plan, as of that date. Actuarial value shall be determined on the basis of methods and assumptions approved by the Trustees for purposes of this Article, upon recommendation of the Plan's enrolled actuary.

(3)  The unfunded vested liability shall be the amount, not less than zero, determined by subtracting the value of the Plan's assets from the Plan's liability for vested benefits. The Plan's assets are to be valued

34

EXHIBIT NO. 2-35
PAGE NO. 57

on the basis of rules adopted for this purpose by the Trustees upon recommendation of the Plan's enrolled actuary.

(d) The balance of the Plan's unfunded vested liability as of December 31, 1979, is the amount determined as of December 31, 1979, reduced by 5 percent of such amount for each succeeding complete Plan Year.

(e) Annual Change in Unfunded Vested Liability.

(1) The change in the Plan's unfunded vested liability for a Plan Year is the amount (which may be less than zero) determined by subtracting from the unfunded vested liability as of the end of the Plan Year the sum of:

(A) The balance (as of the end of the Plan Year) of the unfunded vested liability as of December 31, 1979; plus,

(B) The sum of the balances (as of the end of the Plan Year) of the changes in the unfunded vested liability for each Plan Year that ended after December 31, 1979, and before the Plan Year for which the change is determined.

35

EXHIBIT NO. 2-36
PAGE NO. 58

       (2)   The balance of the change in the Plan's unfunded vested liability for a Plan Year is the change in the Plan's unfunded vested liability for that year reduced by 5 percent of such amount for each succeeding complete Plan Year.

(f)  Reallocated Liability Amount.  For each Plan Year ended after December 31, 1979, the reallocated liability amount is:

       (1)   Any amount of unfunded vested liability that the Trustees determine in the Plan Year to be uncollectible for reasons arising out of cases or proceedings under Title 11 of the United States Code or similar proceedings;

       (2)   Any amount of unfunded vested liability that the Trustees determine in the Plan Year will not be assessed as a result of the limitations on liability described in Sections 4209, 4219(c)(1)(B), or 4225 of ERISA against an Employer to whom a notice of liability under Section 4219 of ERISA has been sent; and,

       (3)   Any amount that the Trustees determine to be uncollectible or unassessable in the Plan Year for other reasons under stan-

36

EXHIBIT NO. 2-37
PAGE NO. 59

> > dards not inconsistent with such regula-
> > tions as may be prescribed by the Pension
> > Benefit Guaranty Corporation.

The balance of the reallocated liability amount for a Plan Year is the reallocated liability amount for that year reduced by 5 percent of such amount for each succeeding complete Plan Year.

(g) Apportionment of Unfunded Liability to Employer that has Withdrawn.

> (1) Old Liability. An Employer's proportional share of the balance of the Plan's un-funded vested liability as of December 31, 1979, shall be determined by multiplying the balance of the Plan's unfunded vested liability as of that date, by a fraction:

> > (A) The numerator of which is the total contributions that the Employer was obligated to make to the Fund pur-suant to the Terminated Agreement(s) for the five Plan Years ended on December 31, 1979; and,

> > (B) The denominator of which is the total of Employer contributions reported in the audited financial statements of the Fund for the five Plan Years ended December 31, 1979, less any

37

EXHIBIT NO. 2-38
PAGE NO. 60

contributions otherwise included in that total made by any Significant Employer that was not obligated to contribute to the Fund in the period from April 29, 1980, to December 31, 1980, or had withdrawn from the Plan before April 29, 1980.

(2) Liability Changes and Reallocated Uncollectibles. An Employer's proportional share of the change in unfunded vested liabilities and of the reallocated liability amount for a Plan Year ending after December 31, 1979, shall be determined by multiplying each of those amounts, if any, as determined for a Plan Year, by a fraction:

(A) The numerator of which is the total contributions that Employer was obligated to make to the Fund pursuant to the Terminated Agreement(s) for the Plan Year in which the change or reallocation arose and the four preceding Plan Years ("Apportionment Base Period"); and,

(B) The denominator of which is the total adjusted Employer contributions to

38

EXHIBIT NO. 2-39
PAGE NO. 41

the Fund with respect to the Apportionment Base Period, determined as follows:

(i)   The total adjusted Employer contributions shall be the total Employer contributions with respect to the Apportionment Base Period, determined under paragraphs (ii) and (iii), reduced by any contributions otherwise included in the total that were made by a Significant Employer that was not obligated to contribute to the Fund in the Plan Year in which the change or reallocation arose, and by any other Employer to which a notice of withdrawal liability was sent by the Trustees within the Apportionment Base Period.

(ii)  The total contributions shall be the Employer contributions accrued in each of the Plan Years in the Apportionment Base Period, if received by

39

EXHIBIT NO.   2-40
PAGE NO.   62

the Trustees within three months after the end of the Plan Year, plus any contributions received in that period that accrued earlier but were not included, for purposes of this denominator, as contributions with respect to any earlier Plan Year.

(iii) Notwithstanding paragraph (ii), with respect to any Plan Year ended on or before December 31, 1979, the total Employer contributions shall be as reported in the audited financial statements of the Fund for those Plan Years. The total for any Plan Year ending after December 31, 1979, shall be reduced by the amount of any Employer contributions included, consistent with these provisions, in any previous annual total.

40

EXHIBIT NO. 2-41
PAGE NO. 63

(3) For purposes of the denominators of the fractions described in paragraphs (1) and (2), "Significant Employer" means:

    (A) An Employer that contributed, in any one Plan Year of the relevant period, at least 1 percent of total Employer contributions to the Fund in the period, as determined for purposes of the relevant denominator or, if lower, $250,000 and

    (B) Any other Employer that was a member of an Employer association, a group of Employers covered by a single Collective Bargaining Agreement, or a group of Employers covered by agreements with a single labor organization, if the contribution obligations of substantially all members of the group ceased in a single Plan Year and the group's aggregate contributions to the Fund in any one Plan Year of the relevant period totalled at least 1 percent of total employer contributions to the Plan in the period or, if lower, $250,000.

41

EXHIBIT NO. 2-42
PAGE NO. 64

(4)   Notwithstanding paragraphs (1) and (2),
      the numerators of the fractions described
      in those paragraphs shall not include
      contributions that the Employer was
      obligated to make under a Collective
      Bargaining Agreement for which there was a
      permanent cessation of the Employer's
      obligation to contribute before April 29,
      1980, if and to the extent that the
      Employer demonstrates that its total
      contribution obligation included contribu-
      tions properly allocable to such a Collec-
      tive Bargaining Agreement.

(h)   Limitations on the Amount of Withdrawal
      Liability.

      (1)   Deductible.   From the initial liability
            amount, there shall be deducted the lesser
            of:

            (A)   $50,000, less the excess of the
                  initial liability amount over
                  $100,000; or,

            (B)   3/4 of 1 percent of the Plan's un-
                  funded vested liability as of the
                  end of the Plan Year preceding the
                  Employer's withdrawal, less the

42